

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-10-2001

# USA v. Pena

Precedential or Non-Precedential:

Docket 00-5169

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"USA v. Pena" (2001). *2001 Decisions.* Paper 231.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/231

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 10, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-5169

UNITED STATES OF AMERICA

v.

ARTHUR PENA,
       Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 98-cr-00022-4)
District Judge: Honorable Jerome B. Simandle

Argued July 20, 2001

Before: SCIRICA, RENDELL, and ROSENN, Circuit  Judges,

(Filed October 10, 2001)

      Anthony J. Iacullo, Esq. [ARGUED]
      Iacullo & Saluti
      103 Park Street, 3rd Floor
      Montclair, NJ 07042
      Counsel for Appellant
       Arthur Pena

      Elizabeth S. Ferguson, Esq.
       [ARGUED]
      George S. Leone, Esq.
      Office of United States Attorney
      970 Broad Street, Room 700
      Newark, NJ 07102
      Counsel for Appellee
       United States of America

OPINION OF THE COURT

RENDELL, Circuit Judge.

Arthur Pena was a veteran police officer of the West New York, New Jersey, Police Department ("WNYPD"), who, along with other officers, accepted bribes in return for permitting illegal poker video gambling machines to operate without interference in certain areas of New Jersey. At issue on appeal is the proper application of S 2C1.1 of the United States Sentencing Guidelines to the facts of this case, and, specifically, the propriety of the District Court's 13-level increase in Pena's offense level based on the benefit received by the payor of the bribes from Pena's illegal conduct between 1989 and 1992. He contends that, because the government failed to prove the "net benefit" to the gambling machine distributors who paid the bribes at issue, he should have been sentenced based on the aggregate amount of the bribes. As a part of this argument, he urges that the "net benefit" calculation requires a showing of the net profit to the distributor. The District Court correctly rejected his arguments based on our prior decision in United States v. Schweitzer, 5 F.3d 44 (3d Cir. 1993). We will affirm.

Pena was convicted by a jury in the United States District Court for the District of New Jersey of conspiracy to commit extortion in violation of 18 U.S.C. S 1951(a) for "protection" payments made between 1989 and 1996 by one of the distributors of the machines at issue, GMOG.1 GMOG was owned by George Riveiro, who operated it with the help of his brother Luis. GMOG placed the machines in establishments such as bars and restaurants, maintained the machines, and split the profits with the establishments' owners. Patrons would deposit money into the machines for game credits on which they made wagers; at the end of the game, the credits would be exchanged for cash. GMOG

_____

1. The jury also found Pena guilty on two counts of an indictment charging him with subscribing false 1991 and 1992 tax returns in violation of 26 U.S.C. S 7206(1).

2

collected the money from the machines weekly, figured out the credits, reimbursed the establishment for the money paid out to winners, and then split the profit with the establishment on a 50:50 basis.

The evidence at trial revealed routine payments had been made by GMOG to Pena in the amount of $2,000 each month from 1989 through April 1993. At sentencing, the government introduced the affidavit of FBI Special Agent Kenneth O'Connor recounting interviews he had with Luis Riveiro on December 3 and 7, 1999, regarding the m onies derived from the operations. The affidavit contained the following evidentiary averments:

> 4. During the above-described conversation, [Luis] Riveiro told me, in substance and in part, that approximately two years ago he totaled the weekly figures and determined how much GMOG collected on a yearly basis from 1988 through 1995. Riveiro stated that in 1988 they earned $323,000, in 1989 the amount was $986,300, in 1990 the amount was $1,021,700, in 1991 they earned $726,800, in 1992 they earned $452,110, in 1993 they earned $302,630, in 1994 they earned about $158,290, and in 1994 they earned about $41,380. He further told me that about ten to fifteen percent of these figures were derived from legal activity such as children's games and juke boxes and that about ninety-five percent of these earnings were from machines in West New York, New Jersey.

> 5. In December 1999 I spoke to George Riveiro, the owner of GMOG. He told me in substance and in part, that GMOG earned an average of $5,000-$6,000 in profit per week during the most profitable years. George Riveiro also told me that his brother Luis Riveiro actually collected the revenues from the locations where they placed machines and thus, would be in a better position to provide a more accurate recollection of GMOG's revenues.

App. at 107.

Pena argued at sentencing that the government had failed to prove the specific "net profit" or "net benefit" and that the court must sentence him based on the aggregate

bribe amount proven -- $96,000. The government argued that it had in fact proven the benefit received by GMOG, namely, the revenues GMOG realized from the illegal operation.

The District Court considered the parties' arguments and adjourned the hearing in order to consider the issue in the context of a recent split in the rulings of the courts of appeals as to the meaning of "net benefit" under the sentencing guidelines.

The District Court reconvened the sentencing hearing two months later and ruled that, consistent with our opinion in United States v. Schweitzer, "net benefit" in this situation was the monies realized from the illegal operation, quoting our statement in Schweitzer that "net benefit . . . has nothing to do with expense incurred by the wrongdoer in obtaining the net value received" where the transaction was wholly illegal. 5 F.3d at 47.

The District Court then relied on the revenues shown to have been received by GMOG for the 50:50 split from illegal operations. Then, based on the information Luis Riveira provided O'Connor, the Court netted out 20% to account for business outside of West New York and the proceeds from the few legitimate machines, and therefore made a fact finding of $2,573,000 as "GMOG's net benefit received for the years 1989 through 1997." App. at 81-82.

The District Court noted that the government had offered two different calculation methods, but both arrived at approximately the same number.2 Based on this finding, Pena's offense level was 25, and with a Criminal History

_____

2. The District Court explained:

> The amounts of winnings are about as precise as we can determine them in hindsight. This figure is also supported by a completely different method, namely, if we had taken the probation department's estimates of 16,000 a month in `89 and 70,000 a month in `90, `91 and `92, we get a figure of approximately 2.7 million dollars, those are figures that come from paragraph 146. So the two sums are quite consistent by either method of calculation.

App. at 82.

level of 1, the guideline range was 57 to 71 months. The District Court sentenced Pena to 57 months.

The District Court had jurisdiction pursuant to 18 U.S.C. S 3231. We exercise jurisdiction over this appeal of the Court's sentencing determination based on 28 U.S.C. S 1291 and 18 U.S.C. S 3742(a)(2).

We begin our review by examining the guideline provisions at issue found at S 2C1.1, which states that the base offense level of 10 is to be increased in certain circumstances:

> Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right
>
> . . . .
>
> (A) If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest, exceeded $2,000, increase by the corresponding number of levels from the table in S 2F1.1 (Fraud and Deceit).

U.S. Sentencing Guidelines Manual S 2C1.1(b)(2)(A) (2000) (emphasis added).

It is conceded that, here, the value of the "benefit received in return for the payment" was greater than the value of the payment, or the loss to the government. Accordingly, we look to Application Note 2, which explains:

> . . . The value of "the benefit received or to be received" means the net value of such benefit. Examples : (1) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (2) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000. Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received. In the above examples, therefore, the value of the benefit received would be the same regardless of the value of the bribe.

5

U.S. Sentencing Guidelines S 2C1.1, cmt. n. 2 (2000).

The "Background" section of the Application Notes states, further:

> Where the value of the bribe exceeds the value of the benefit or the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe. Moreover, for deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is higher.

U.S. Sentencing Guidelines S 2C1.1, cmt. background (2000).

While Pena criticizes the vague nature of the numbers contained in the O'Connor affidavit as a basis for calculating the dollar amounts for purposes of sentencing, he does not challenge its sufficiency or the court's factual finding as such.[3] Rather, he attacks the District Court's ruling that the revenues, rather than the net profits, are the proper measure of "net value" of the benefit. He complains that the District Court has misinterpreted the guidelines. Accordingly, we will review the District Court's ruling under a de novo standard. United States v. Geevers, 226 F.3d 186, 189 (3d Cir. 2000).

Pena relies to a great extent on the decision of the Seventh Circuit Court of Appeals in United States v. Sapoznik, 161 F.3d 1117 (7th Cir. 1998), decided after our ruling in Schweitzer. Pena limits his discussion to the consideration of these two cases. We note that if we were to follow Sapoznik, Pena might in fact succeed, while, under Schweitzer, he clearly will not.

Sapoznik also involved illegal gambling operations, and the court there held that the government had failed to prove net profit. Interestingly, Chief Judge Posner, in his opinion, notes:

_____

3. Pena attacks the substance of O'Connor's affidavit based only on his view that specific net revenue needed to be shown and that, lacking such proof, the bribe amount should be used. Appellant's Brief at 18-20.

> The government concedes that the relevant "benefit
> received" is indeed profit (net revenue) and not (gross)
> revenue. U.S.S.G. S 2C1.1, Application Note 2; United
> States v. Glick, 142 F.3d 520, 525-26 (2d Cir. 1998);
> United States v. Schweitzer, 5 F.3d 44, 47 (3d Cir.
> 1993); but cf. United States v. McAlpine , 32 F.3d 484,
> 489 (10th Cir. 1994).

161 F.3d at 1119. Given this concession, the court
examined the record and held that the case should be
remanded for resentencing, because the record contained
no proof by the government regarding the costs of the illegal
enterprise. While we understand that the government's
concession may have misdirected that court, we reject the
notion that profit is relevant for a consideration of "net
value" of "benefit." We also reject the thought that our
decision in Schweitzer, or the Second Circuit's decision in
Glick, stood for such a conclusion, as the Seventh Circuit's
reference seems to indicate. Although in certain cases the
profit may be equal to the net value, as illustrated by
Application Note 2, and as we discuss in more detail below,
the concept of netting out costs to arrive at profit is
inappropriate under the Guidelines section when the
transactions are entirely illegitimate.

Pena argues that Sapoznik requires us to consider only
GMOG's net profit by subtracting out costs related to the
illegal activity, and he tries to find in Schweitzer some
further support. In Schweitzer we first considered the
meaning of "net value" of benefit. Schweitzer was a private
investigator who bribed former and current employees of
the Office of Inspector General for confidential information
that he then supplied to others for a fee. After paying
$4,680 for the information, he sold it for roughly two times
that amount. We rejected Schweitzer's contention that the
$4,680 should be deducted -- his cost for conducting the
illegal activity -- noting that the cases he relied upon allow
for the deduction of the value that would be derived in a
legitimate transaction not induced by a bribe, whereas he
was arguing not that value derived, but rather expenses
incurred, should be deducted. We noted that the concept of
value had nothing to do with costs incurred. In Schweitzer
we did not specifically address the issue of net profit or the

7

deduction of costs of operation, because the "amount paid" appears to have been the bribe amount specifically not deductible under the guidelines.

Nonetheless, we think that our focus in Schweitzer was entirely correct. Application Note 2 actually provides the proper focus. U.S. Sentencing Guidelines, S 2C1.1, cmt. n.1 (2000). It speaks in terms of "net value" of benefit. Id. The examples it recites clearly demonstrate that, to arrive at the proper amount, we are to deduct the value legitimately and actually given, from the value received, to arrive at the "net value" of the benefit caused by the bribe. Id. Thus, if a $10,000 piece of property is sold for $2,000, the bribe caused an $8,000 benefit -- the purchaser received a $10,000 piece of property for only $2,000. Similarly, if a $20,000 profit is made on a $150,000 contract, the contract provided $130,000 of services and/or product -- value given -- so the benefit caused by the bribe was $20,000. In both examples, there was, as we noted in Schweitzer, "a sale item" that "had a value that a purchaser in a legitimate transaction would receive," and"that value was not received as a result of the bribe and should not be considered in determining the degree of the bribe giver's culpability." We stated, in clear terms: "This concept of `net value received' has nothing to do with the expense incurred by the wrongdoer in obtaining the net value received. This is clear from the Note's instruction that the value of the bribe is not to be deducted in calculating the `net value.' " 5 F.3d at 47.

We were entirely correct in Schweitzer, and when we apply this reasoning to the case at hand it is apparent that the illegal gambling operations involved no legitimate object or service of value, and that every dollar received by GMOG was received because of the bribe -- not because of the intrinsic value of anything being provided. As a result, the entire amount of the revenue was the benefit. Unlike a situation where something of legitimate value was provided to an individual, or for the benefit of society, such as services or a physical item of value, the operations here were wholly illegal and therefore there was no other value to "net out."

8

Pena attempts to address this aspect of Schweitzer by arguing that the government should have netted out monies that the machines generated that may have been legitimate. But the District Court already took into account Riveiro's estimate of legitimate proceeds from legitimate machines or other locations, and Pena's counsel admitted that all revenues from the gambling machines were illegal. To require that other monies be deducted would convert the test into one in which the government must investigate whether any legitimate value had been given in an illegal operation. While the government does have the burden to establish the value, United States v. McDowell , 888 F.2d 285, 291(3d Cir. 1989), we are not prepared to impose on the government the onerous task of proving that each separate expense transaction in an illegal operation had absolutely no legitimate value or benefit. Pena asks us to read too much into the concepts of "value" and"benefit." We believe it more appropriate to limit the exercise to an assessment of what is obvious in the fact pattern. In both of the examples in the guidelines it is quite apparent that something legitimate was in fact provided in the transaction, and the bribe-caused portion easily identifiable. Here, it is just as easily seen that nearly all the revenues were derived from the illegal operation of the machines and were directly attributable to, and derived on account of, the bribes in question.

We also note that the notion of deducting costs associated with furthering purely illegal activity, as the reasoning of Sapoznik would call for, is simply illogical. First, it would be nearly impossible to establish because most criminals do not keep detailed records regarding the costs of maintaining their illegal business. Second, these expenses were tainted because they were incurred in furthering the criminal activity.

Thus, we have held, and we reiterate, that "net value" of the "benefit" received does not mean "net proceeds." Rather, it means benefit received after netting out the value of what -- if anything -- of legitimate value, was provided.

It is interesting to note that the case law reference to net profit, or netting out costs, may have arisen due to the fact that, in some instances, the two concepts -- deducting

9

value given and deducting direct costs -- may be somewhat the same. For instance, consider the case of the doctor who bribes an official and, as a result, obtains many referrals for the sale of lymphodema pumps, as in United States v. Leon, 2 F. Supp. 2d 592 (D.N.J. 1998). If the doctor has sold the pumps for $100, but they were worth $60-- which he did pay, and which value the purchaser did receive -- there are two ways of looking at the fact that the net benefit was $40. Perhaps a court might describe the underlying principle in terms of permitting the deduction of direct costs, i.e., a cost of goods sold. Based on our reading of the guidelines, however, we view this in terms of "netting out" the legitimate value given, i.e., the portion that was received not as a result of the bribe, but rather in return for the product's intrinsic value. There is simply no such value in this case.

We note that, as we mentioned above, the District Court here took extra time to examine this issue and "got it right." The court drew on Schweitzer and its obvious implications in this case, correctly reasoning:

> As applied to the present case, Schweitzer teaches that where the object of the conspiracy, namely, the protection of illegal gambling, is illegitimate, all proceeds flowing to the conspirators -- here, GMOG-- are to be regarded as the benefit received in return for the extortion payment. The "net value" of the benefit received by Pena's coconspirators at GMOG is the gross revenues they derived from the protected illegal gambling in West New York in the relevant time period.

App. at 72.

The District Court then noted that the proper analysis had been similarly conducted in United States v. Leon, summarizing the court's explanation in that case:

> The Court's task is to determine the difference between what did happen as a result of the bribe and what would have happened if not [for] the bribe. The Court would permit the deduction of legitimate costs that would have been incurred in a legitimate transaction regardless of a bribe payment, and the Court would not

10

deduct illegitimate costs that would not have occurred in the absence of a bribe payment.

App. at 72 (paraphrasing Leon, 2 F. Supp. 2d at 597).

The District Court concluded:

I hold that in calculating the "benefit received" from payment of extortion to protect illegal gambling, the proper figure equals the revenues received by the bribe payors (here, the GMOG owners) derived from the illegal gambling operations which were being protected, unreduced by the amount of the bribes themselves or by the other costs of maintaining the illegal gambling business.

App. at 75.

Accordingly, the District Court committed no error in its reasoning and ruling, and we will affirm its judgment of conviction and sentence.

A True Copy:
Teste:

Clerk of the United States Court of Appeals for the Third Circuit

11