PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-1165

———

UNITED STATES OF AMERICA

v.

MARIA LIANIDIS,

Appellant

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 07-cr-00665-001)
District Judge:  Honorable Garrett E. Brown, Jr.

———

Argued December 2, 2009
Before:  FISHER, HARDIMAN
and STAPLETON, *Circuit Judges*.

(Filed: March 19, 2010 )

Anna M. Durbin
Peter Goldberger (Argued)
50 Rittenhouse Place
Ardmore, PA  19003-2276
        *Counsel for Appellant*

George S. Leone
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ  07102

Glenn J. Moramarco (Argued)
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ  08101
        *Counsel for Appellee*

OPINION OF THE COURT

FISHER, *Circuit Judge*.

Maria Lianidis pled guilty to three counts of bribery of a federal employee in violation of 18 U.S.C. § 201.  On appeal, Lianidis contends that the District Court erred at sentencing by imposing a 16-level increase based on its determination that the "benefit received" under U.S.S.G. § 2C1.1(b)(2) was between $1,000,000 and $2,500,000.  To resolve this issue, we must

define the proper calculation of "benefit received" in cases where illegal bribes are used to obtain what would otherwise be legal contracts. Following the Fifth Circuit's approach in *United States v. Landers*, 68 F.3d 882 (5th Cir. 1995), we hold that "benefit received" under § 2C1.1(b)(2) is the net value, minus direct costs, accruing to the entity on whose behalf the defendant paid the bribe. Because the District Court did not properly articulate and apply this standard, we will vacate and remand for re-sentencing.

## I.

## A.

From 1992 through 2001, Lianidis worked as a computer specialist for the Federal Aviation Administration ("FAA") at the Atlantic City International Airport. During this period, Steven Lianidis, Maria Lianidis's husband, founded Digital Management Systems, Inc. ("DMS"), a family-owned computer services engineering company located in Absecon, New Jersey. DMS designed and supported computer applications for aviation systems through contracts with the FAA. In 2001, Lianidis left the FAA to serve as DMS's president, a position she held through 2007.

Darrell Woods, an FAA employee at the Atlantic County Technical Center from 1996 through 2005 and a long time friend of Lianidis, was in charge of overseeing the DMS contracts. From July 9, 2001, through December 26, 2004, Lianidis made a series of about 19 cash payments, totaling

3

approximately $155,000,[1] to Woods. In return, Woods improperly steered contracts supporting the FAA's "Service Movement Advisor" computer system ("SMA contracts") to DMS and, once the contracts were awarded, improperly authorized increases on those contracts.

The SMA Statement of Work ("SOW") specified certain award conditions, including the following:

> "As a condition of award the Contractor shall perform the work activities described in this SOW primarily at the [FAA Technical Center] and shall maintain an office within 5 miles of that site."

(App. at SA59 & SA142, § 1.2.) To comply with this office requirement, DMS initially rented a small facility, presumably from a third party. Then, in June 2003, Lianidis's husband formed a real estate company named DESFO, LLC and used it to purchase a larger facility within five miles of the Technical Center, which DESFO then rented to DMS. In addition to its rent, DMS incurred a litany of costs at the DESFO office, including, *inter alia*, salaries, payroll taxes, and costs associated with computer equipment, supplies, cleaning, insurance, legal and professional assistance, and meals and entertainment. (*Id.* at 72-79.)

---

[1]Although the Presentence Investigation Report states that the total was $159,000, the parties agreed at the Sentencing Hearing that the total was closer to $155,000. (App. at 12.)

The SMA contracts were in effect for a total of six years. Although the contracts were procured with bribes, DMS's actual work on the contracts was legitimate. (PSR ¶ 37.) Overall, the FAA paid DMS a total of $6,783,877.33 under the SMA contracts. During the six-year period, Lianidis received a total salary of $445,298, and her husband received a total salary of $601,525.[2]

From September 2004, through March 11, 2005, the FAA prepared a competitive solicitation for work related to a separate computer system, Surface Management Systems ("SMS"). On November 23, 2004, after asking for Lianidis's suggestions, Woods inserted a provision in the SMS solicitation that excluded larger qualified bidders and restricted competition to smaller businesses closer to DMS in size. However, the solicitation was canceled – apparently due to the bribery investigation – prior to any contract award.

**B.**

On August 9, 2007, a grand jury charged Lianidis with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; seventeen counts of bribery of a federal employee, in violation of 18 U.S.C. § 201; and eight counts of money laundering, in violation of 18 U.S.C. § 1957. On February 6, 2008, Lianidis pled guilty to three counts of bribery of a federal employee in the United States District Court

[2]Any minor discrepancies as to the exact figures do not affect this appeal.

5

for the District of New Jersey. The Plea Agreement expressly stated that the parties were unable to agree on the calculation of value, benefit, and loss pursuant to U.S.S.G. § 2C1.1(b)(2). (App. at 88.)

The Presentence Investigation Report ("PSR") recommended that the District Court impose a 16-level increase based on its conclusion that the "benefit received" under § 2C1.1(b)(2) and the reference table in § 2B1.1 was between $1,000,000 and $2,500,000. (PSR ¶¶ 37-38.) At the December 23, 2008 Sentencing Hearing, the District Court agreed, based on what appears to be two, alternate theories.

First, citing the Fifth Circuit's decision in *United States v. Landers*, 68 F.3d 882 (5th Cir. 1995), the District Court held that the proper calculation of "benefit received" under § 2C1.1(b)(2) deducts direct costs, but not indirect costs, from the gross proceeds of the illegally obtained contracts. (App. at 14.) In applying the *Landers* rule, the District Court refused to include Lianidis's proposed additional costs as direct costs:

> "Now, the defendant also asserts that she had costs of purchasing a building within five miles of the FAA site with a security system, a lab, computer equipment, backup equipment, additional landscaping, trash removal, pest control, dues and subscriptions, cleaning services, and rent which was paid by DMS, the defendant's corporation, to the defendant who purchased the building and [that] this should be considered a direct cost and deducted. [The] Government

6

disputes that. I do not find that that is direct cost."

(*Id.* at 15.) The District Court reiterated shortly thereafter,

"As far as the deduction for the overhead of the building as a direct cost to the contract, building that they purchased and they received rent from the corporation, I don't think that is a direct cost and I will not consider it as such under the guidelines."

(*Id.* at 16.) In so holding, the District Court evidenced its agreement with the Government, which estimated the "benefit received" to be $3,287,192 by subtracting as direct costs only "direct labor costs and other salary and wages paid, payroll taxes, [and] employee benefits." (*Id.* at 13.)

As an alternative theory, the District Court used Lianidis's and her husband's salaries as a proxy for "benefit received":

"As far as the alternative theory, . . . [Lianidis] was able to enjoy the lifestyle provided by [her and her husband's] salaries which totaled over a million dollars. And although she says that she worked for it, that's not the point. The point is that we have these bribes paid in connection with this work.

. . .

7

The defendant and her husband were not the only employees, but this was their company and they obtained over a million dollars in cash salaries. What would have happened had they competed fairly for the contract is not before me. There's no good work exception to the bribery laws."

(*Id.* at 15-16.) Finding that the salaries also warranted a 16-level increase, the Court adopted the PSR's recommendation.[3]

---

[3]Counsel for Lianidis contended at oral argument that the salary theory was the sole basis for the District Court's decision because it was the only theory set forth in the PSR. (PSR ¶ 37-38.) The record is unclear. On one hand, the Court began with a discussion of *Landers* and classified the salary theory "as the alternative theory." (App. at 15.) On the other hand, the Court stated, in conclusion, that it was adopting the PSR:

"So having evaluated the presentence report, I adopt it and find it to be correct. So what we do have here is an offense level of 25, a criminal history category one, which gives us a range of 57 to 71 months under the advisory guidelines."

(*Id.* at 17.) Furthermore, the Court imposed a 16-level increase even though the Court could have imposed an 18-level increase under the *Landers* direct cost approach. *See* U.S.S.G. § 2B1.1.

We will address both theories. The District Court's use of a new legal theory is not problematic because neither Federal

The 16-level increase resulted in a total offense level of 25, which, when combined with Lianidis's criminal history category of I, produced an advisory Sentencing Guidelines range of 57 to 71 months of imprisonment. After granting a two-level downward variance of nine months on account of the defendant's compelling personal circumstances, the Court imposed a sentence of 48 months of imprisonment, followed by three years of supervised release. The Court also ordered a fine of $75,000 – $25,000 for each count – and a special assessment of $300. The Court entered judgment on December 30, 2008,[4]

---

Rule of Criminal Procedure 32 nor our case law require a district court to abide by a probation officer's interpretation of the Sentencing Guidelines. *Cf. United States v. Hudson*, 491 F.3d 590, 596 (6th Cir. 2007) ("While case law requires notice before a district court departs or varies from the recommended guideline sentence, . . . [it does] not require notice when a district court interprets the guidelines differently from the probation officers-when it applies the Guidelines in a manner different from what is recommended in the presentence report." (quotations and citations omitted)). Moreover, Lianidis has not asserted that she was unduly surprised by the Government's $3,287,192 figure, which was calculated using the PSR's proceeds figure of $6,783,877.33 and the salary, tax, and benefit figures provided by Lianidis herself.

[4]The judgment did not become final, and thus the appeal did not ripen, until the filing of an agreed order for the criminal forfeiture of $150,000 on June 10, 2009.

9

and Lianidis filed a timely notice of appeal of the 16-level increase on January 13, 2009.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). "We review the District Court's interpretation of the Sentencing Guidelines de novo," but we review the District Court's application of law to fact with due deference. *United States v. Aquino*, 555 F.3d 124, 127 (3d Cir. 2009). "We review the District Court's factual findings for clear error." *United States v. Cohen*, 171 F.3d 796, 802 (3d Cir. 1999).

## III.

Lianidis argues on appeal that the District Court erred in imposing a 16-level increase pursuant to § 2C1.1(b)(2) under both its *Landers* approach and its salary theory. We will address the problems with each approach in turn, after a brief overview of § 2C1.1(b)(2).

### A. Background

Under U.S.S.G. § 2C1.1(b)(2), the offense level of a defendant convicted of bribing a federal employee increases based on the "benefit received or to be received" in exchange for the bribe:

> "If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000, increase by the number of levels from the table in § 2B1.1 . . . corresponding to that amount."

U.S. Sentencing Guidelines Manual § 2C1.1(b)(2). We have held that the Government bears the burden of showing "benefit received." *United States v. Pena*, 268 F.3d 215, 220 (3d Cir. 2001) (citing *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989)). Here, the Government alleges that the "benefit received" is between $1,000,000 and $2,500,000, which warrants a 16-level increase. U.S.S.G. § 2B1.1(b)(1).

To determine whether the Government has met its burden, we must define the scope of "benefit received." We are aided by the § 2C1.1 application notes, which discuss "benefit received" in terms of "net value" and "profit":

> "The value of 'the benefit received or to be received' means the net value of such benefit. Examples: (1) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (2) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the

benefit received is $20,000. Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received. In the preceding examples, therefore, the value of the benefit received would be the same regardless of the value of the bribe."

U.S.S.G. § 2C1.1 cmt. n.3. Because the Sentencing Guidelines commentary "is akin to an agency's interpretation of its own legislative rules[,]" we will give the application notes "controlling weight" unless the commentary "violate[s] the Constitution or a federal statute[]" or "is plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45 (1993) (quotations and citations omitted).

## B. The *Landers* Approach

Lianidis takes issue with two aspects of the District Court's application of *Landers* in calculating "benefit received." First, Lianidis asserts that, under our decision in *Pena*, 268 F.3d 215, the proper measurement of "benefit received" is the gross revenue less legitimate costs of the SMA contracts, which Lianidis suggests is slightly distinct from the *Landers* approach. Second, Lianidis argues that, even following *Landers*, the District Court erred in refusing to include her and her husband's salaries and DMS overhead as direct costs of the SMA contracts. The Government maintains that the District Court's analysis is sound.

12

**1.**

Although this Court has addressed the scope of "benefit received," or "net value," in some instances, we have yet to define the calculation of "benefit received" in a case where, as here, the contract underlying the bribery is legal. We first examined "net value" in *United States v. Schweitzer*, where a defendant bribed a public official to obtain confidential information held by the Social Security Administration. 5 F.3d 44, 45 (3d Cir. 1993). There, we held that the "benefit received" is "the market value of the information secured for [the defendant's] client." *Id.* at 47. We declined to subtract the value of the bribe in calculating "benefit received" because the "concept of 'net value received' has nothing to do with the expense incurred by the wrongdoer in obtaining the net value received." *Id.* This, we continued, "is clear from the Note's instruction that the value of the bribe is not to be deducted in calculating the 'net value.'" *Id.* (referencing U.S.S.G. § 2C1.1 cmt. n.3 ("Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received.")).

We extended *Schweitzer* in *Pena*, which, like *Schweitzer* and unlike the instant case, concerned an illegal underlying transaction: the defendant police officer accepted bribes in return for permitting illegal gambling machines to operate without interference. *Pena*, 268 F.3d at 216. In calculating the "benefit received," we refused to subtract operation costs when the transaction was illegal: "the concept of netting out costs to arrive at profit is inappropriate under the Guidelines section when the transactions are entirely illegitimate." *Id.* at 219. We expressly declined to follow *United States v. Sapoznik*, where

13

the Seventh Circuit, in another case involving illegal gambling, remanded for re-sentencing because the government had not set forth evidence regarding the costs of the illegal enterprise, which, according to the Seventh Circuit, prevented the calculation of net value. *Id.* (citing *Sapoznik*, 161 F.3d 1117, 1119-20 (7th Cir. 1998)). We explained in conclusion that the "'net value' of the 'benefit' received does not mean 'net proceeds.' Rather, it means benefit received after netting out the value of what-if anything-of legitimate value, was provided." *Id.* at 221. We found that there was "no such value" in that case. *Id.*

Lianidis hones in on the *Pena* phrase "legitimate value." However, contrary to Lianidis's characterization, *Pena* does not stand for the proposition that "net value" is necessarily calculated by subtracting all "legitimate" costs from gross revenue. Rather, *Pena* held that it is inappropriate to subtract the costs of illegal transactions in calculating "net value." Since the *Pena* court did not give meaningful discussion to the costs of legal transactions, nor to whether any differentiation between direct and indirect costs should exist, the precise calculation of "net value" under § 2C1.1(b)(2) when the underlying transaction is legal is still, at the very least, an open issue for this Court.

We can look to our sister circuits for guidance. The seminal case is *Landers*, the Fifth Circuit decision applied here by the District Court. Similar to the instant case, the defendant in *Landers* made cash bribes to obtain favorable contracts for the company he represented. 68 F.3d at 883. The district court calculated "net value" by subtracting the costs of the goods sold from the gross value of the contracts. *Id.* at 884-85. On appeal,

14

the defendant argued that the district court should have subtracted both the cost of the goods sold and a share of his company's overhead from the contract price. *Id.* at 884. In a well-reasoned opinion, the Fifth Circuit agreed with regards to the cost of the goods sold, but not with regards to the overhead. *Id.* at 886.

To start, the Fifth Circuit determined that the use of the adjective "net" before "value," as well as the examples in the § 2C1.1 application notes, "implies that some costs should be deducted" in the calculation of "benefit received." *Id.* at 884. The court then drew a line between "direct" costs, which it held were deductible, and "indirect" costs, which it held were not.[5] *Id.* at 884-86. The court's rationale was two-fold. First, the court analogized "indirect costs" to the bribe itself, which application note 3 of § 2C1.1 states is not subtracted in the calculation of "net value":

> "The rationale for refusing to deduct the amount of a bribe from gross value applies equally to indirect costs. Like a bribe, indirect costs have no

_____

[5]The Fifth Circuit rejected the defendant's contention that "net value" is synonymous with "net profits": "If the Sentencing Commission wanted courts to use a 'net profit' figure, presumably it would have employed that term." *Landers*, 68 F.3d at 885. The court also held that the Sentencing Commission had implicitly rejected the concept of "net profits" "by noting that one type of direct costs, bribes, is not deductible from gross profits." *Id.*

impact on the harm caused by the illegal conduct. This is true whether one considers the pecuniary benefit to the bribing party or the pecuniary loss to a competitor. For both parties, the benefit of an additional contract is measured by gross revenue minus direct costs. By definition, indirect costs do not affect that value."

*Id*. at 885. Second, the court held that excluding "indirect costs" is consistent with the Guidelines' general goal of achieving reasonable uniformity in sentencing because "[a]llowing a wrongdoer to deduct indirect costs would result in differing culpability not only for similar acts, but also for the very same act." *Id*. The court provided a hypothetical as an example:

"Take for example a case in which two defendants bribe the same government official for the same contract. If indirect costs were deductible, the defendants could receive different sentences if one of them worked for a company with higher indirect costs."

*Id*. at 886. In conclusion, the court calculated "net value" by subtracting the costs of the goods sold, but not the company's overhead. *Id*.

*Landers* has not fallen on deaf ears. The Courts of Appeals that have addressed this issue – the Second, Seventh, and Eleventh Circuits – have cited *Landers* with approval. *See United States v. Glick*, 142 F.3d 520, 525 (2d Cir. 1998) ("In calculating the amount of 'improper benefit[]' [under

16

§ 2E5.1(b)(2)][6] only direct costs, not indirect costs, should be subtracted from the gross value received."); *Sapoznik*, 161 F.3d at 1119 (agreeing that fixed costs should be included in net value but finding it unclear whether the costs at issue were indeed fixed); *United States v. DeVegter*, 439 F.3d 1299, 1304 (11th Cir. 2006) ("We agree with the Fifth Circuit's approach which subtracts direct costs, but not indirect costs, from profits to determine the net improper benefit [under § 2B4.1(b)(1)].").[7] *See also Cohen*, 171 F.3d at 803 (citing *Landers* generally); *United States v. Leon*, 2 F. Supp. 2d 592, 596 (D.N.J. 1998) ("I hold that only 'direct costs' are deductible in calculating the amount of the benefit conferred [under § 2B4.1(b)(1)]. . . . Indirect costs are not deductible."). We agree that the Fifth Circuit's reasoning is sound: indirect costs, like bribes, do not impact the harm caused by the bribery, and allowing the deduction of indirect costs would foster inconsistency in sentencing. Accordingly, we will adopt the *Landers* approach and subtract only direct costs, and not indirect costs, when calculating "net value" under § 2C1.1(b)(2).

---

[6]Application note 4 of U.S.S.G. § 2E5.1, which concerns bribery affecting an employee benefit plan, directs courts to the commentary of § 2C1.1 in determining "value of the improper benefit to the payer."

[7]Application note 2 of U.S.S.G. § 2B4.1, which applies in cases of commercial bribery, directs courts to the commentary of § 2C1.1 in determining "value of the improper benefit to be conferred."

**2.**

Lianidis also challenges the District Court's application of *Landers*. Lianidis asserts that both the overhead of the DMS office, which Lianidis alleges only serviced the SMA contracts, and her and her husband's reasonable salaries under the SMA contracts are direct costs of the SMA contracts. In response, the Government argues that it would be misleading to claim that one hundred percent of the DMS overhead can be attributed to the SMA contracts and that Lianidis's and her husband's salaries must be included in "benefit received" as a matter of law.[8]

We hold at the outset that, although it is the Government's burden to show "net value," *Pena*, 268 F.3d at 220, the defendant bears the burden of producing the necessary documents. To hold otherwise would, in practice, prevent the Government from meeting its burden of proof.

In applying the *Landers* rule, we will look to the Fifth Circuit's sound definitions of "direct" and "indirect" costs. We hold that "direct" costs are

> "all variable costs that can be specifically identified as costs of performing a contract. This might include, for example, transportation costs for the goods in question. Thus, variable overhead costs that cannot easily be identified to

---

[8]We address this latter incorrect statement of law more fully in Section C, *infra*.

18

a specific contract are not direct costs.  This definition differs from the accounting term 'direct costs' in that it excludes those variable costs that cannot readily be apportioned to the contract."

*Landers*, 68 F.3d at 884 n.2.  "Indirect" or "fixed" costs are, on the other hand,

"the costs incurred independently of output.  For example, rent and debt obligations are costs a business incurs no matter how many contracts it receives.  For the most part, overhead costs are fixed costs.  The marginal increase in variable overhead costs from a wrongfully obtained contract is normally so *de minimis* that accounting for them during sentencing would be impractical."

*Id.* at 885 n.3.  Put succinctly, whether a cost is direct or indirect depends on whether it can be easily attributed to the specific contract at issue.

Here, the District Court, after summarizing Lianidis's proposed additional direct costs, merely concluded without explanation, "I do not find that that is direct cost." (App. at 15.) Because the Court did not engage in the foregoing analysis, we will remand for the District Court to consider whether any portion of the DMS overhead or Lianidis's and her husband's salaries can be easily attributed to solely the SMA contracts.

19

## C.  The Salary Theory

Lianidis also argues on appeal that the District Court erred in basing its calculation of "benefit received" on her and her husband's salaries.  According to Lianidis, the proper measurement of "benefit received" or "net value" under § 2C1.1(b)(2) is the gross revenue minus legitimate costs to DMS under the SMA contracts, not the salary paid to Lianidis or her husband.  The Government disagrees.  Asserting that Lianidis's benefit came in two forms – company profit as well as her and her husband's salaries – the Government contends that the calculation of "benefit received" "should not change depending on whether a business owner who ultimately will receive all of the company's profit, chooses to designate some of that profit as salary."  (Appellee's Br. at 18.)  In response, Lianidis argues that this "ordinary language approach" to "benefit" is inappropriate under the Guidelines.  (Appellant's Br. at 22.)

We must agree with Lianidis.  The District Court's use of Lianidis's and her husband's salaries as a proxy for "benefit received" runs contrary to the Guidelines commentary and our own precedent in *Cohen*, 171 F.3d 796.

Example 2 of U.S.S.G. § 2C1.1, application note 3 clarifies the proper measurement of "benefit received" in cases where bribery is used to procure contracts.  The pertinent language is as follows:

20

> "(2) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000."

U.S.S.G. § 2C1.1 cmt. n.3 (2008). The example clearly directs courts to consider the profit made on the illegally obtained contract. Although the example does not expressly disallow the use of salaries paid under such contracts, we must give "controlling weight" to the note's suggested use of contract profit. *See Stinson*, 508 U.S. at 45.

Our opinion in *Cohen* confirms this reading of § 2C1.1(b)(2). In *Cohen*, a wholesale meat distribution salesman was found guilty of mail fraud based on his participation in a company bribing scheme: he received $500 a week in cash from the company, in addition to his regular salary paycheck, in exchange for distributing the company's kickbacks. 171 F.3d at 799-800. Like the instant case, the parties disagreed at sentencing over the correct interpretation of "improper benefit" under U.S.S.G. § 2B4.1.[9] *Id.* at 802. The Government argued that the phrase refers to the net value gained by the company as a result of the defendant's kickbacks; the defendant argued that the phrase refers to the money pocketed by the defendant himself. *Id.* at 802-03. The district court agreed with the defendant, but we reversed. Citing example 2 of U.S.S.G. § 2C1.1, application note 3, we held that "'improper benefit' refers to the net value accruing to the entity on whose behalf the individual paid the bribe." *Id.* at 803. Accordingly, we

---

[9]*See* note 7, *supra*.

remanded the case to the district court to re-calculate "improper benefit" with instructions to examine the company's alleged profit on the $10 million worth of meat purchased from the company as a result of the bribes. *Id.* at 803-04.

The instant case presents the same issue. Similar to the salesman who distributed kickbacks to encourage customers to purchase his company's meat, Lianidis gave Woods illegal cash payments to obtain FAA contracts for DMS. Lianidis contends that, under *Cohen*, the "benefit received" is the gross revenue minus costs accruing to DMS. The Government, in contrast, argues not only that "benefit received" refers to the money that accrued to Lianidis as an individual, but also that "benefit received" includes Lianidis's salary. Bound as we are by *Cohen*, we cannot accept the Government's argument. The "benefit received" under § 2C1.1(b)(2) is not the salary paid to Lianidis and her husband, for which she and her husband legally worked and which the Government does not dispute was reasonable, but rather the "net value" received by DMS itself under the SMA contracts.[10]

_____

[10] The dissent would hold that "net benefit" includes the salaries paid to Lianidis and her husband in part because a sentencing judge would be unable to discern whether a company owner like Lianidis was hiding company profit through the payment of excessive salaries. We do not share this concern. Regardless, we are not free to disregard the § 2C1.1 application notes, which direct us to determine profit and which have "controlling weight," simply because we conclude that compliance with the notes will be onerous. *See Stinson*, 508

22

This interpretation of § 2C1.1(b)(2) makes sense. Basing a calculation of "benefit received" on a salary paid under an illegally obtain contract is both over- and under-inclusive. The use of salary is over-inclusive because Lianidis and her husband gave their labor, not just a bribe, in exchange for their salaries. The use of salary is under-inclusive because Lianidis and her husband, as owners of DMS, did not depend on their salaries to receive benefits under the SMA contracts.

In summary, we hold that the District Court erred in finding that Lianidis had between $1,000,000 and $2,500,000 in "benefit received" under § 2C1.1(b)(2) based on Lianidis's and her husband's salaries.

## IV.

To reiterate, we hold that the proper calculation of "benefit received" under U.S.S.G. § 2C1.1(b)(2) is the net value, minus direct costs, accruing to the entity on whose behalf the defendant paid the bribe. We will vacate Lianidis's sentence and remand to the District Court for re-sentencing in accordance with this standard.[11]

---

U.S. at 45.

[11]The Government asks that we affirm on alternate grounds based on its argument that the "benefit . . . to be received" by Lianidis under the SMS contract was between $1,000,000 and $2,500,000. Because the District Court did not engage in the necessary factfinding, we decline to reach this

issue.  It is not our role as an appellate court to investigate Lianidis's intent, the extent to which Lianidis's bribes were connected to the SMS contract, or the SMS contract's value. *See Ingersoll-Rand Financial Corp. v. Anderson*, 921 F.2d 497, 504 (3d Cir. 1990) ("This court is not a factfinding tribunal.").

HARDIMAN, J., dissenting.

I agree with the Majority's adoption of the *Landers* test to interpret USSG § 2C1.1(b)(2). I likewise agree that Lianidis bore the burden of producing the evidence necessary to determine the nature and amount of her costs that were directly attributable to performing work procured by the bribe. Unlike my colleagues, however, I would affirm Lianidis's judgment of sentence for two independent reasons. First, the District Court did not clearly err in determining which costs incurred by DMS were directly attributable to its ill-gotten contracts. Second, because DMS was a closely-held business and Lianidis was its President, the District Court did not clearly err when it held that the portions of the salaries Lianidis and her husband paid themselves that were attributable to their work on the ill-gotten contracts constituted the "benefit received" from her bribes.

The District Court expressly adopted the *Landers* test in calculating the net value of the benefit received, and held Lianidis's proposed deductions were not direct costs. The Majority concludes that the District Court reached this conclusion "without explanation" and "did not engage" in a more elaborate analysis of the *Landers* test. But the Majority does not endeavor to explain how the District Court's finding of fact, curt though it was, constituted "clear error." *See United States v. Cohen*, 171 F.3d 796, 802 (3d Cir. 1999). Lianidis bore the burden of producing evidence to support her claim that some costs were deductible because they were directly attributable to the ill-gotten contracts. The record indicates that she presented the District Court with a laundry list of business expenses and requested a deduction for each. Several of these expenses were classic "fixed costs," such as rent and upkeep of

DMS's office space, and Lianidis offered little or no evidence connecting them to the FAA contracts she procured through bribery. Absent such proof, I find no "clear error" in the District Court's conclusion that those costs were not deductible in determining the "benefit received" under § 2C1.1(b)(2).[1]

Even if Lianidis had carried her burden of showing which costs were directly attributable to her ill-gotten FAA contracts, I would affirm the judgment of the District Court because it correctly found that the $1,046,823.80 in wages Lianidis and her husband paid themselves for work they performed on the contracts procured through bribery were part of the "net benefit" received as a result of her bribe. In this regard, I disagree with the Majority's treatment of DMS as "the entity on whose behalf the defendant paid the bribe." Because DMS was a closely-held corporation and Lianidis, as its President, controlled her salary and her husband's salary, I would hold that Lianidis was the beneficiary of the bribes.

In holding otherwise, the Majority relies on *United States v. Cohen*, 171 F.3d 796 (3d Cir. 1999). In *Cohen*, an employee obtained contracts for his employer through bribery, and we concluded that the employer was "the entity on whose behalf"

---

[1] Lianidis proffered evidence through her accountant that DMS paid $2,128,207 in wages to subcontractors for work performed on the FAA contracts at issue here. This does not change the Guidelines range found by the District Court, however, because the net benefit received by the company still would have exceeded $1 million.

-2-

the bribe was paid. *Id*. at 803. This conclusion made perfect sense because Cohen was not an owner or officer of the company. That is decidedly not the case here. Lianidis owned and controlled DMS, she was the beneficiary of the company's profits, and she determined her own and her husband's salaries. This control enabled Lianidis to pay herself as an employee (salary) or as a shareholder (distribution of profits). Under the rule established by the Majority, the owner of a closely-held business who pays herself a handsome salary, as did Lianidis, is subject to a lower Guidelines range than an owner who pays herself a modest salary during the year and pays out the profits of the company at year end, even though both owners end up with the same amount of money. Even worse, an employee such as Cohen—who through bribery procures a contract that results in great financial benefit to his employer but little or no benefit to himself—would be subject to a higher Guidelines range than Lianidis, who chose to pay herself and her husband over $1,000,000 generated by her own bribery.[2]

For the foregoing reasons, I would hold that when an employee pays bribes to win contracts for a corporation that she owns and controls, the employee herself is the beneficiary of the bribe, and the amount of the benefit is equal to the sum of (1) the portion of her salary attributable to the bribe-induced

---

[2] The Majority's analysis of Application Note 2(2) works fine in the typical case where the person who commits the bribery does so on behalf of a corporation that employs him. I find Application Note 2(2) factually inapposite to closely-held companies like DMS for the reasons stated herein.

contract[3] and (2) the profits the corporation earned from that contract (after paying her salary). Because the District Court did not clearly err in calculating either of these amounts,[4] I respectfully dissent.

---

[3] I recognize that salaries are not pure profit to an employee because working imposes a labor cost on the employee. As a matter of theory, the net benefit accruing to an employee would be the amount by which her salary exceeds this cost. In practice, however, I can discern no way for a sentencing court to determine this cost. Moreover, I am loathe to permit a deduction for the value of labor that one had the opportunity to perform only through bribery. Even if such a determination were feasible, the employee would still be required to submit evidence demonstrating that her labor costs were directly attributable to the ill-gotten contract. Because Lianidis has made no effort to do so here, I view the entire portion of the salaries she paid to herself and her husband as part of the net benefit she received from her bribes.

[4] The District Court did not add these amounts together in calculating the benefit received, instead treating them as alternative measures of the benefit. This was the approach advocated by the government, which was bound by its plea agreement with Lianidis not to argue for an offense level higher than 17, and as a result could not argue that the value of the benefit received was greater than $1 million to $2.5 million.