**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1604
_____

UNITED STATES OF AMERICA

v.

JAMES DAVIS,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:15-cr-00138-001)
District Judge: Hon. Wendy Beetlestone
_____

Submitted under Third Circuit L.A.R. 34.1(a)
December 15, 2020
_____

Before: GREENAWAY, JR., SHWARTZ, and FUENTES, Circuit Judges.

(Filed: January 5, 2021)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

SHWARTZ, Circuit Judge.

James Davis appeals his convictions for honest services wire fraud and conspiracy, arguing that the Government did not prove that Davis's campaign contributions to the Philadelphia Sheriff were part of an "explicit" quid pro quo. He also challenges his sentence, claiming that the Government failed to show exactly how much of his business flowed from his corrupt bargain. Because there was sufficient evidence from which a reasonable jury could find an explicit quid pro quo, we will affirm Davis's convictions. Moreover, because the Government need not prove the exact amount of business Davis received as a result of his bribes, we will also affirm his sentence.

I

Davis owned Reach Communications Specialists, Inc. ("Reach"), an advertising company, and RCS Searchers, Inc. ("RCS"), a title search and deed preparation business. Since 1989, Reach published property foreclosure notices for the Philadelphia Sheriff's Office. RCS conducted title searches and prepared deeds for those properties. This arrangement yielded Davis's businesses millions of dollars.

To secure that business, Davis bribed John Green, the elected Sheriff of Philadelphia, with a stream of benefits, which took the form of non-campaign and campaign contributions. For example, Green told Davis he had found a house that he wanted. Davis then bought and repaired that home, allowed Green to live there rent-free, then sold it to Green at a loss of over $39,000. In addition, Davis gave Green $62,000 to purchase his Florida retirement home. For the closing, Davis wired $258,151.32 directly to the title company. Although Green repaid Davis for the wire transfer, as well as an

additional $2,100, Green still netted more than $70,000 in cash from Davis during their relationship. Davis also provided Green and his family other benefits. For example, Davis hired Green's wife to work at one of his companies, paying her over $89,000 between 2004 and 2010.

Davis also provided Green campaign benefits. For instance, Green initially did not want to seek re-election in 2007, but Davis and others persuaded him to run. According to Janet Pina, Green's former chief deputy, Davis encouraged Green to run because Davis wanted to "maintain [his] contracts" with the Sheriff's Office. J.A. 776. Similarly, Barbara Deeley, Green's chief deputy after Pina, testified that "Mr. Davis was worried about his company, and, you know, a new sheriff coming in." J.A. 1237. Harold James, a close friend of Green, also testified that Davis wanted Green to run because "he was doing work for him." J.A. 2559.

Green told Davis and Deeley that they would have to do "all of the work" for the campaign. J.A. 1239. When Deeley told Davis that she could not handle the work alone, Davis told her not to worry about it and worked on "almost everything" with Deeley. J.A. 1239-40. In fact, when Green needed more money and advertising to fend off a well-funded primary opponent, Davis helped with both. To that end, Reach provided over $148,000 in unreported campaign advertising services, without charge, and Davis instructed Deeley to falsely report the services on the Campaign Finance Report ("CFR") as a $30,000 debt, as well as to record false expenditures on the CFRs, including more than $12,000 in payments to Reach.

3

Davis also contributed cash. Throughout the campaign, Deeley kept Green apprised of the finances, and when the campaign needed money, Green told Deeley to "talk to Davis." J.A. 1278. Davis "always came through." App. 1272. When the 2007 campaign was running out of money, Deeley approached Davis for help, and he told her not to worry and thereafter deposited $50,000 into the campaign's account. This contribution was above the campaign contribution limits, and Davis instructed Deeley not to record the deposit on the CFR. When the campaign needed more than $12,000 to attend a charity event and purchase a related advertisement, Green again told Deeley to "go talk to Davis." J.A. 1284-85. Davis again paid the amount but hid the contribution by making the check payable to Deeley and falsely indicating that it was to pay her for a summer home rental. Deeley in turn deposited the check and provided the funds to the campaign from her account. Davis again instructed Deeley not to record the payment on the CFR. Davis also used his daughter to funnel funds to the campaign. Specifically, he directed his daughter to donate $2,500 to the campaign, the maximum allowable contribution under the 2007 campaign finance limits, and then repaid her.

In exchange for these noncampaign and campaign benefits, Green funneled lucrative Sheriff's Office business to Davis's companies. With Green's approval, from 2002 to 2010, Reach received over $22 million for Sheriff's Office advertising work and RCS received over $12 million for performing real estate services for Sheriff's Office

sales. This business constituted about ninety percent of Davis's approximately $1.9 million in net income from 2004 to 2010.[1]

Davis sought continued access to the Sheriff's Office when Green considered retiring. Among other things, Davis paid for Harold James and Jewell Williams, a candidate to replace Green, to fly to Florida to meet with him and Green to discuss who would replace Green when he retired. James believed that Davis facilitated the meeting to safeguard his business with the Sheriff's Office upon Green's retirement.

Like Davis, Green tried to conceal their arrangement. Green knew that he was supposed to provide written contracts for professional services to the City Law Department for its review, but he only began to put contracts in writing in 2003, and did so only after a City Controller's audit report criticized his practice of using oral agreements. Even after Green began using written contracts, the contracts with Davis's companies did not include all the services that Davis provided to the Sheriff's Office. Green further sought to conceal his relationship with Davis by failing to disclose the gifts and loans from Davis on his City of Philadelphia Statement of Financial Interest forms.

Following trial, a jury found Davis guilty of conspiracy to commit honest services wire fraud and to obtain property under color of official right in violation of 18 U.S.C.

---

[1] Davis also influenced who else got Sheriff's Office work. For instance, Andrew Miller owned a company that issued title insurance policies and distributed funds from tax lien and delinquent sales for the Sheriff's Office. Miller sought to obtain the more lucrative mortgage foreclosure work. To get that business, Miller met with Green and Davis. Similarly, Jacqueline Roberts owned a title agency and met with Green and Davis before securing some of her work with the Sheriff's Office.

§ 371 honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346, 1349;two

counts of filing a false tax return in violation of 26 U.S.C. § 7206(1); and three counts of

willful failure to file a tax return in violation of 26 U.S.C. § 7203.  Based on Davis's

Criminal History Category I, and the approximately $1.7 million in benefits Davis

received from the Sheriff's Office in return for the multiple bribes to Green, his total

offense level was thirty-four, resulting in a Sentencing Guidelines range of 151 to 188

months.  The District Court varied downward and sentenced Davis to 121 months'

imprisonment, ordered him to make a $872,395.83 tax payment, and entered a

$1,718,540 million forfeiture judgment.  Davis appeals.

## II[2]

## A[3]

The jury found that Davis committed honest services wire fraud and conspiracy to

do so by, among other things, using campaign contributions to bribe Green.[4]  Davis

contends that there was insufficient evidence upon which the jury could conclude that an

explicit quid pro quo existed.  We disagree.

When reviewing a sufficiency of the evidence challenge, we must determine

"whether, after viewing the evidence in the light most favorable to the prosecution, any

---

[2] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[3] We review sufficiency challenges de novo.  See United States v. Bruce, 405 F.3d 145, 149 (3d Cir. 2005).

[4] The jury also heard evidence about non-campaign payments, but Davis only challenges the finding that the campaign contributions constituted illegal quid pro quos.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis omitted).[5]

Here, the jury found that Davis bribed Green with, among other things, campaign contributions. In a political system based upon private campaign contributions, care must be taken to ensure that a donor is not prosecuted based on only "proof of a campaign donation followed by an act favorable to the donor." United States v. Siegelman, 640 F.3d 1159, 1170 (11th Cir. 2011). Rather, a campaign contribution becomes an illegal bribe "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."[6] McCormick v. United States, 500 U.S. 257, 273 (1991).[7]

Davis asserts that the words "express" and "explicit" mean the same thing, but he is incorrect. See, e.g., Siegelman, 640 F.3d at 1171 (rejecting argument that explicit in McCormick means express); United States v. Blandford, 33 F.3d 685, 696 (6th Cir. 1994) (observing "that by 'explicit' McCormick did not mean 'express'"); United States v.

---

[5] The Government argues that Davis tries to embed a waived challenge to the jury instructions in his sufficiency argument. The District Court instructed the jury that if it relied on campaign contributions to convict Green, "[t]he agreement must be explicit, but there is no requirement that it be express." App. 5903, 5915. Davis does not challenge the accuracy of the instruction. Furthermore, our review of a sufficiency challenge is based upon the elements of the offense, and not how those elements are described in the instructions. See Musacchio v. United States, 136 S. Ct. 709, 715 (2016).

[6] The parties do not dispute that Green awarding Davis Sheriff's Office contracts constitutes an official act.

[7] No party disputes that McCormick's reasoning extends to honest services wire fraud, and we will assume that it does. See, e.g., United States v. Ring, 706 F.3d 460, 466 (D.C. Cir. 2013); Siegelman, 640 F.3d at 1170.

Carpenter, 961 F.2d 824, 827 (9th Cir. 1992) (holding that the "explicitness requirement" of McCormick does not require an official to "specifically state[] that he will exchange official action for a contribution"). "Express" refers to something that is "declared in terms; set forth in words . . . and not left to inference." Blandford, 33 F.3d at 696 n.13 (emphasis omitted) (quoting Express, Black's Law Dictionary 580 (6th ed. 1990)). "Explicit," on the other hand, means "[n]ot obscure or ambiguous, having no disguised meaning or reservation. Clear in understanding." Id. (alteration in original) (emphasis omitted) (quoting Explicit, Black's Law Dictionary 579 (6th ed. 1990)). Thus, an explicit arrangement need not be "memorialized in a writing" or spoken aloud. Siegelman, 640 F.3d at 1171. "To hold otherwise . . . would allow defendants to escape criminal liability through 'knowing winks and nods.'" Id. (quoting Evans v. United States, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring)). Indeed, "a quid pro quo with the attendant corrupt motive can be inferred from an ongoing course of conduct," or "implied from [the parties'] words and actions." Evans, 504 U.S. at 274 (Kennedy, J., concurring) (italics omitted). Thus, "direct and circumstantial evidence," including the context of the arrangement, may be used to prove that there was a "clear and unambiguous" promise of official action in exchange for payment. Carpenter, 961 F.2d at 827; cf. United States v. Allen, 10 F.3d 405, 411 (7th Cir. 1993) ("Vague expectations of some future benefit should not be sufficient to make a payment a bribe."). Therefore, whether based on direct or circumstantial evidence, the "Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Evans, 504 U.S. at 268.

Here, there is sufficient evidence from which the jury could have concluded that Davis and Green entered into a corrupt bargain. On one side of that bargain, Davis provided Green with a "stream of benefits." See United States v. Wright, 665 F.3d 560, 568 (3d Cir. 2012) ("[Bribery] does not require that each quid, or item of value, be linked to a specific quo, or official act. Rather, a bribe may come in the form of a 'stream of benefits.'" (emphasis omitted) (quoting United States v. Bryant, 655 F.3d 232, 240-41 (3d Cir. 2011))). For instance, during the 2007 campaign, Davis contributed more than $65,000 in cash and over $148,000 in free advertising services. These contributions came within the context of a larger stream of benefits that Davis provided to Green, including arranging to provide Green a renovated house at a loss, giving Green significant funds for Green's retirement home, and supplying cash. Davis provided these benefits in return for an explicit benefit: to receive multi-million-dollar contracts from the Sheriff's Office. Green had the power to award Sheriff's Office business and gave Davis over $35 million of it between 2002 and 2010. Continuity of this business was critical to Davis as a significant amount of his companies' work came from the Sheriff's Office, and this flow of steady and lucrative work provided strong motivation for Davis to encourage Green to continue to serve as Sheriff in 2007. Witnesses testified that this was indeed the reason why Davis wanted Green to run and why he had a strong interest in Green's eventual successor.

The pair also sought to conceal the scope of their relationship, which provides a basis to infer that they understood that they had made a corrupt bargain. Davis's work for the Sheriff's Office was based on an oral agreement which was reduced to writing

9

only after an audit disclosed its existence. Even after the agreements were reduced to writing, they failed to disclose the full scope of the work Davis's companies performed and the fees they received. Similarly, Green did not disclose on his City Financial Interest forms the gifts, loans, and funds Davis provided. Furthermore, Davis ensured that the CFRs failed to disclose or falsely reported the funds he provided to Green's campaign. These acts of concealment provided the jury with a basis to conclude that Davis and Green fully understood that Davis would provide Green with benefits in the form of campaign contributions and Davis would receive millions of dollars in Sherriff's Office work, and that neither wanted their arrangement to be known. See United States v. Terry, 707 F.3d 607, 615 (6th Cir. 2013) ("[T]he government never presented a formal agreement between Russo and Terry stating that Russo's gifts would control Terry's actions. But . . . there was ample evidence for the jury to infer that an agreement nonetheless existed between the two men."). Because there was sufficient evidence upon which the jury could find that an explicit quid pro quo existed, we will affirm its conspiracy and honest services fraud verdicts.[8]

B[9]

---

[8] Because the evidence supported the conspiracy and honest services wire fraud convictions, there was no spillover from any allegedly invalid convictions that could have tainted Davis's convictions for tax fraud and failure to pay taxes, and thus we will affirm those as well.

[9] We review interpretation of the Sentencing Guidelines de novo and factual findings for clear error. United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).

10

Davis also challenges the calculation of his Sentencing Guidelines offense level. When a defendant is convicted of a bribery-related offense, the offense level may be increased based on "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest." U.S.S.G. § 2C1.1(b)(2). The "'benefit received' under § 2C1.1(b)(2) is the net value, minus direct costs, accruing to the entity on whose behalf the defendant paid the bribe." United States v. Lianidis, 599 F.3d 273, 275 (3d Cir. 2010). Direct costs are those "that can be specifically identified as costs of performing a contract." Id. at 281 (quoting United States v. Landers, 68 F.3d 882, 884 n.2 (5th Cir. 1995)).

The Probation Office calculated Davis's "total profit/net income" for the period of 2004 to 2010 based on his reported profit from Reach/RCS and his net income from Reach as determined by the IRS, resulting in a figure of $1,909,489. It then considered that ninety percent of that business came from contracts with the Sherriff's Office and found $1,718,540.10 as the value Davis received. That benefit resulted in a sixteen-level increase in Davis's offense level. See U.S.S.G. § 2B1.1(b)(1).

Davis argues the District Court erred in calculating his offense level under the Sentencing Guidelines because it considered all the funds from his business with the Sheriff's Office from 2002 to 2010, rather than determining exactly how much of that business was "in return for" his bribes. According to Davis, at least some of that business resulted from his existing relationship with Green, not the bribes.

11

"[T]he threshold for establishing a causal connection" under § 2C1.1(b)(2) "is low." United States v. McNair, 605 F.3d 1152, 1230 (11th Cir. 2010) (collecting cases). "To show that the bribes benefited the people paying them . . . it is enough for the government to show that the bribes facilitated the . . . operations." United States v. Sapoznik, 161 F.3d 1117, 1119 (7th Cir. 1998).

The bribe scheme facilitated Davis's businesses. Davis provided Green benefits for years, and, during that time, Davis received millions of dollars of Sherriff's Office business. Even if Davis's initial business with the Sheriff's Office occurred before the bribery scheme took root, the evidence revealed that Green thereafter received a stream of benefits, Davis received more and more business, and the pair sought to conceal their arrangement. When Davis grew concerned that this pipeline for work would dry up if Green were no longer the Sherriff, he actively persuaded Green to run for reelection and provided funds and services to ensure Green was reelected. When Green ultimately decided to retire, Davis sought to play a role in identifying Green's successor to ensure that he continued to receive Sheriff's Office business. Thus, the District Court correctly determined that the benefits Davis received were in return for the benefits he gave to Green.

The District Court also assigned a conservative net value to the benefits Davis received. Davis's companies earned $35 million from the work performed for the Sheriff's Office. To assign a value, the Court used the amount received during the year in which Reach received the lowest percentage of its income from the Sheriff's Office, and considered that ninety percent of Davis's business came from that Office. This

12

calculation was tethered to the record and hence was not clear error.  See Sapoznik, 161 F.3d at 1118-19 (rejecting argument that "the government failed to show how much of [the bribers' gambling revenue] was actually due to [the defendant's] bribe-induced efforts to protect the illegal gambling" as "too speculative an inquiry to force on the sentencing process").  Thus, Davis's sentencing challenge lacks merit.

## III

For these reasons, we will affirm the judgment of conviction.